UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONJA WICKS,<br><br>              Plaintiff,<br><br>           v.<br><br>AMERICAN TRANSMISSION CO.<br>LLC, et al.,<br><br>              Defendants. | Civil Action 07-02313 (HHK) |

**MEMORANDUM OPINION**

Tonja Wicks ("Wicks"), who is Black, brings this action against her former employer, American Transmission Company, LLC and its corporate manager, ATC Management, Inc. (collectively "ATC").[1] Wicks alleges that ATC unlawfully discriminated against her on the basis of her race and gender in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401 *et seq.*[2] Presently before the Court is ATC's motion for summary judgment [#26]. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion must be granted.

**I. BACKGROUND**

ATC owns and operates transmission lines that are used to convey energy in the upper Midwest part of the United States. In January 2006, Wicks began working for ATC in its D.C.

---

[1] This action was brought in the District of Columbia Superior Court but was removed to this Court when ATC invoked this Court's diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

[2] In her complaint, Wicks also asserts a racial harassment claim (Count I) and a retaliatory discharge claim (Count III) against ATC. Wicks no longer pursues these claims. *See* Pl.'s Opp'n at 1, n.1.

office as Director of Federal Affairs and at some point began working in the D.C. office with William Burlew, who, as Manager of Federal Affairs, reported to Wicks. Before ATC hired Wicks, Burlew expressed interest in becoming the Director of Federal Affairs, but was not considered for the position. However, he was part of the team that interviewed applicants for the position and ultimately recommended that Wicks be hired over other candidates.

Nina Plaushin, Director of Government and Regulatory Affairs, served as Wicks's immediate supervisor and Burlew's second-line supervisor. In November 2006, Plaushin left ATC and was replaced by Randall Satterfield.

A few weeks after Wicks assumed the Director of Federal Affairs position, Burlew and Wicks's relationship began deteriorating. Wicks claims that Burlew was "bad-mouthing" her to people inside and outside ATC and was insubordinate, delaying or failing to complete particular assignments. Wicks also asserts that Burlew made racially offensive comments about her race to other individuals, though not to her.

Burlew also made several complaints about Wicks. According to Plaushin, Burlew "was not satisfied with the distribution of job responsibilities in the DC office and he felt that [Wicks]'s management style failed to adequately show respect for his abilities." Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. 4 ("Plaushin Letter") at 1. Burlew also stated in his response to his performance review that he believed Wicks was attacking his ethics and integrity by stating that he engaged in acts of plagiarism. Both Wicks and Burlew made ethics complaints against the other, but neither complaint resulted in any findings of unethical behavior.

In February 2006, Plaushin hired Hope Hills of Circle Consulting Group "to coach [Wicks] and [Burlew] to resolve the conflict." *Id*. A couple of months after seeking Hills's help,

Plaushin met with Wicks and Burlew and advised them that the "end of the year was the timeline [she] had for seeking marked improvement," and that "lacking additional progress in resolving the conflict, other actions would need to be considered." *Id.* at 2. By the end of the summer, Hills told Plaushin that she "had come to an impasse." *Id.* According to Plaushin, Hills felt that Burlew "was unable to take responsibility for his role in the conflict and was not open to working to resolve the issues." *Id.*

In December 2006, Satterfield replaced Plaushin as Director of Regulatory Affairs. Satterfield and Dale Landgren, Vice President and Chief Strategic Officer of ATC, met with Wicks and Burlew in early or mid-December and shared their concerns about the state of the D.C. office. In late December, Satterfield returned to the D.C. office and explained to Burlew and Wicks that he would return in early January with someone in Human Resources to engage in a discussion regarding the roles and responsibilities of Wicks and Burlew and of the D.C. office. Satterfield testified that he informed Wicks and Burlew that "the office had been dysfunctional from that professional communication standpoint for a while and we were going to engage in a process . . . to see if we could fix those difficulties and that if we weren't able to one of the results might be that one or both might lose their jobs." Defs.' Mot. for Summ. J. ("Defs.' Mot."), Satterfield Dep. at 95.[3] Also in December 2006, Satterfield hired another consultant, John Heidke of Right Management, Inc., to "make an assessment as to the ability of the staff of the office to function professionally and competently to the benefit of the company going forward." *Id.* at 36.

---

[3] Wicks disputes this assertion. She claims that Satterfield never told her that her job was at risk.

In early January 2007, Heidke met with Satterfield to develop a plan and a time line to improve Burlew and Wicks's relationship. On January 17, 2007, Satterfield returned to D.C., with Jackie Wirth who was employed in the Human Resources Department to meet with Wicks and Burlew. The parties reached an agreement regarding Wicks and Burlew's respective roles and responsibilities. *See* Defs.' Mot., Wicks Dep., Ex. 12 ("2007 Agreement"). The 2007 Agreement also listed ATC's expectations going forward. At the meeting, Satterfield and Wirth gave Wicks and Burlew specific "to do's" and asked them to create a stakeholder list.

Later in January, on January 25, Heidke met with Wicks and Burlew individually and as a team to assess their working relationship and how their relationship affected the functioning of ATC's D.C. office. In a letter to Maureen Hogan, ATC's Director of Human Resources, and Satterfield, Heidke stated that "[t]he ATC Washington office appears to be functioning poorly and not meeting objectives as required," and "[t]here was plenty of blame to go around." Def.'s Mot., Wicks Dep., Ex. 11 ("Heidke Letter") at 3. Based upon his interaction with Wicks and Burlew, the data he collected from ATC leaders, and a work style instrument Wicks and Burlew completed, Heidke concluded that "such an intractably broken and distrustful relationship is unlikely to be brought back to a fully workable, high functioning level in the near future." *Id*.

In an email exchange dated February 1, 2007, Wicks and Burlew argued regarding the creation of the stakeholder list that they were asked to construct. Burlew forwarded the email exchange to Wirth, who forwarded the emails to Hogan. In an email to Wicks and Burlew dated February 2, 2007, Hogan wrote that "[c]onsidering the difficulty the two of you are already having on what would seem to be a simple task, [Satterfield] and I have determined that we need to return to your office next week to deal with these issues." Defs.' Mot., Satterfield Decl., Ex.

5. On February 7, 2007, Hogan and Satterfield visited ATC's D.C. office and terminated Wicks and Burlew. Satterfield told Wicks that deficiencies in her "judgment, listening, and management" were factors that led to her termination. Pl.'s Opp'n, Ex. 5 ("Wicks Dep.") at 97. Satterfield stated that Wicks had failed to curtail the behavior of Burlew, her "direct report," and that she had not effectively performed the responsibilities of the office. *Id.* at 96.

This suit followed.

## II. LEGAL STANDARD

**A.     Summary Judgment**

Summary judgment may be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002). A material fact is one that is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." *Id.* at 248, 252. A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the nonmovant. *Id.* at 255. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

B.  **District of Columbia Human Rights Act**

The DCHRA makes it unlawful for an employer to "fail or refuse to hire, or to discharge, any individual; or otherwise discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment" based upon, *inter alia*, the individual's "race, color [or] sex." D.C. Code § 2-1402.11(a).

Discrimination claims brought under the DCHRA are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*. *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993) ("This court has 'often looked to cases construing Title VII . . . to aid us in construing the [DCHRA]' [because] [t]he anti-discrimination provisions of both statutes are substantially similar."); *see also Mungin v. Katten Muchin & Davis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997); *Gaujacq v. Electricite de France Int'l North America, Inc.*, 572 F. Supp. 2d 79 (D.D.C. 2008). To prove a violation under the DCHRA, a plaintiff "must demonstrate by a preponderance of the evidence that the actions taken by the employer were 'more likely than not based on the consideration of impermissible factors'" such as race or sex. *Valles-Hall v. Center for Nonprofit Advancement*, 481 F. Supp. 2d 118, 140 (D.D.C. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted)). "[T]he plaintiff may prove [her] claim with direct evidence, and absent direct evidence, [s]he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (quoting *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C. 1997) (internal quotation marks omitted)).

6

## III. ANALYSIS

A. **Direct Evidence of Discrimination**

Wicks asserts that she presents direct evidence of discrimination which proves her claims of unlawful discrimination and defeats ATC's motion for summary judgment. Courts have not defined precisely what constitutes direct evidence of discrimination, however "at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by non-decision makes or statements made by decision makers unrelated to the decisional process itself." *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996) (*Price Waterhouse v. Hopkins*, 490 U.S. 228, 251-52(1989)) (further citations omitted).

Wicks contends that Daniel Doyle, ATC's Vice President of Human Resources, made derogatory comments that are direct evidence of discrimination. According to Wicks, two months before she was fired, Doyle sat with her at a bar and, "effectively, told her that many executives felt that she was simply too feminine for her job." Pl.'s Opp'n at 12. Doyle testified that he took Wicks aside for the purpose of telling her that the executives were concerned that she was too "sweet and syrupy." Pl.'s Opp'n, Ex. 7 ("Doyle Dep.") at 46-47. According to Doyle, they had a "concern with [her] mannerisms in terms of greeting people that affected in our view not only the greeters but those who were around the greeting," and that such mannerisms "left [one] questioning what her intentions were." *Id.* at 47. Doyle compared Wicks's behavior to "a dog humping his master's leg." *Id.* at 49.

Although the comments Doyle made are offensive and derogatory, Wicks has not shown any causal link between the statements and her termination. First, there is no evidence that Doyle was a decision maker insofar as Wicks's termination is concerned. Moreover, in between the

7

time Doyle made the derogatory statements and the time Wicks was fired, in an effort to avoid any terminations, ATC engaged in several steps to try to resolve the tension between Wicks and Burlew, including hiring another outside consultant to attempt to mend the troubled relationship. In sum, Doyle's comments were isolated, remote in time, and have not been shown to have had anything to do with Wicks's termination. Doyle's comments are best characterized as "stray remarks" by an individual who was not involved in the employment decision. Wicks therefore does not present evidence of direct discrimination.

B. **Circumstantial Evidence of Discrimination**

In the absence of direct evidence of discrimination, courts analyze Title VII discrimination claims under the procedural framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). Under this framework, a plaintiff must first establish a prima facie case of discrimination; the defendant must then offer a legitimate nondiscriminatory reason for its actions; if the defendant does so, the plaintiff bears the burden of establishing that the asserted reason is a pretext for unlawful discrimination. *Id.* Where an employer has asserted a legitimate, non-discriminatory reason for an employment decision, however, the first steps in the *McDonnell Douglas* paradigm drop out and "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008).

A plaintiff bears the burden of persuasion to show that a defendant's proffered nondiscriminatory reason for the challenged action is a pretext. *See Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003). A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is false, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence." *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted). A plaintiff may also "attempt[ ] to produce evidence suggesting that the employer treated other employees of a different race, color, sex, or national origin more favorably in the same factual circumstances" than the employer treated the plaintiff. *Brady*, 520 F.3d at 495. Where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts," and summary judgment is appropriate. *Id.*; *see also Paquin*, 119 F.3d at 27-28 ("[I]f [a plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff].").

ATC asserts that deficiencies in Wicks's "judgment, listening skills, and management style" are legitimate nondiscriminatory reasons for her termination. According to ATC, Wicks "failed to exercise proper judgment and listen effectively when communicating and interacting with Burlew and failed to effectively manage him and the office for which she was responsible." Reply Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") at 3. Wicks contends that ATC's asserted explanation is a mere pretext for unlawful discrimination.

9

According to Wicks, ATC's stated reasons for her termination are "vague and overly subjective at best." Pl.'s Opp'n at 10. Wicks also claims that there is no evidence of any such deficiency in her performance, "nor is there any evidence that Defendants raised these claimed deficiencies with [her] at any time before her termination." *Id.*

Wicks's arguments are unpersuasive. At the outset, it is important to note that even if this Court determined that the reasons provided by ATC for its termination of Wicks were "wrong," "[its] action may be justified by a reasonable belief in the validity of the reason given." *George v. Leavitt*, 407 F. 3d 405, 415; *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." (internal quotation marks and alterations omitted)). There is considerable evidence in the record that is substantially not rebutted which indicates that ATC reasonably believed that Wicks was having trouble managing Burlew and that Wicks's "judgment, listening skills, and management style," were at least partly to blame for the mismanagement of the D.C. office. Furthermore, contrary to Wicks's contention, there is evidence that these concerns were expressed to Wicks before her termination.

While Plaushin was still employed at ATC, she hired Hills, an outside consultant, to help with Burlew and Wicks's troubled relationship. After Hills engaged in four months of "coaching activity" with Wicks and Burlew, Plaushin traveled to the D.C. office to meet with them. At this meeting, Plaushin "admonished [Wicks] for failing to adequately delegate work to [Burlew]." Plaushin Letter at 2. Plaushin also informed Wicks and Burlew that "lacking additional progress in resolving this conflict, other actions would be considered." *Id*. Plaushin

10

reiterated her concern about Wicks's ability delegate work in Wicks's 2006 Performance Review and also wrote that Wicks needed to "watch the time management." Defs.' Mot., Plaushin Dep., Ex. 2 at 2.

Plaushin was not the only one who noted Wicks's deficiencies in managing Burlew and the D.C. office. After Plaushin left ATC, Satterfield became the Director of Regulatory Affairs and hired another outside consultant to assist in resolving the problems in the D.C. office. In a letter to Hogan and Satterfield, Heidke provided ATC with an "assessment of the working culture and professional effectiveness of the ATC associates at [its] Washington, D.C. office."[4] Heidke Letter at 1. Heidke stated that the responsibility for Wicks and Burlew's broken relationship rested with both of them. He also stated that he "found little evidence of professional development that [Wicks] has engaged in with [Burlew]," something that he would consider "a requirement of an ATC leader." *Id.* at 2. According to Heidke, "the accountability for the high level functioning of the ATC DC office falls primarily to [Wicks] as the Director." *Id.* at 3. In his opinion, "an effective leader is required to establish an office that embodies" trust, openness, accountability, and interdependence. Heidke believed, however, that "all four of these variables seem to be substandard. And, the likelihood of achieving them . . . seems very low." *Id.*

---

[4] Wicks argues that Heidke's letter is inadmissible hearsay and should not be considered by this Court. *See* Pl.'s Resp. to Defs.' Statement of Material Facts at 26. The letter is not hearsay, as it is not offered to prove the truth of the matter asserted, only the effect on the reader. *See* Fed. R. Evid. 801 (c). The relevant inquiry is not whether Heidke's assessment of Wicks is accurate. Rather, it is whether ATC had a reasonable belief in the validity of the reason given for Wicks's termination and whether its decision to discharge Wicks was based on that belief. *See Hollins v. Federal Nat. Mortg. Ass'n*, 760 A.2d 563 at 574.

Furthermore, Satterfield and Hogan, who both participated in the decision to terminate Wicks,[5] were fully aware of Heidke's assessment prior to Wicks termination on February 7, 2007. Satterfield testified in his deposition that "[t]he process through which Mr. Heidke went and his judgment and assessment of the process and his conclusions were a data point in my decision." Defs.' Mot., Satterfield Dep. at 96.

Wicks also engaged in an email exchange with Burlew that ATC believed violated the 2007 Agreement regarding Wicks and Burlew's individual roles, responsibilities, and interactions with one another. In the email exchange, Wicks and Burlew argued regarding the creation of the stakeholder list that they were required to construct. Wicks and Burlew could not agree on the tasks that they were required to accomplish in order to create the stakeholder list. The email exchange was forwarded to Wirth, who forwarded the emails to Hogan. Wirth resolved the disagreement between Wicks and Burlew but expressed her disappointment "that these sort of details need[ed] [her] involvement." Satterfield Decl., Ex. 4 at 1. She stated that the email exchange shows that Burlew and Wicks "are continuing to focus more on the details of who does or doesn't do what first" instead of focusing on how to work together effectively in an effort to "build a better working relationship and be more successful in our jobs." *Id.* ATC believes that the email exchange between Wicks and Burlew violated the 2007 Agreement, which stated *inter alia* that it is Wicks's "responsibility as the Director to create a collaborative environment where [Burlew] can succeed" and that Wicks and Burlew would "perform their jobs

---

[5] Although Wicks asserts that there is confusing testimony about who made the challenged termination decision, the record indicates that Satterfield, Landgren, Hogan and Wirth participated in some capacity in the decision to terminate Wicks. *See* Pl.'s Opp'n, Ex. 16 at 5; Defs.' Reply, Ex. 2 ("Declaration of Maureen Hogan"); Pl.'s Opp'n, Ex.13, ("Satterfield Dep.") at 13-16.

12

in a professional and cooperative manner." 2007 Agreement at 7. The agreement further stated that "[w]hen/if violations to these agreements/expectations happen [ATC] will take them very seriously." *Id.* Satterfield stated that the violation of the 2007 Agreement was yet another factor that led to the decision to terminate Wicks. Defs.' Reply, Ex. 1, Satterfield Dep. at 60.

Instead of producing evidence that shows ATC's assessment of her management skills was dishonest or not the real reason for her termination, Wicks disputes the merits of ATC's assessment. She argues that she performed her job well and that it was Burlew who was causing the disruption in the D.C. office. In doing so, however, Wicks only attempts to prove that she and ATC disagreed about her job performance. But "[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for 'plaintiff's perception of h[er]self, and of h[er] work performance is not relevant. It is the perception of the decision maker which is relevant.'" *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Smith v. Chamber of Commerce of the United States*, 645 F. Supp. 604, 608 (D.D.C. 1986)).

Wicks's contention that Plaushin's belief that Burlew was the cause of the problems in the Washington office proves pretext is not persuasive.[6] Wicks alleges that Plaushin

---

[6] Wicks also states that Hills believed that Burlew was the cause of the problems in the Washington office and that she recommended that Plaushin terminate him. The only evidence of Hills's alleged statement, however, is Plaushin's letter to Landgren where Plaushin states that Hills "urged [her] to move forward with a process to terminate Bill Burlew." Plaushin Letter at 2. A non-moving party must "produce evidence . . . capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (citing *Celotex Corp.*, 477 U.S. at 324); Fed. R. Civ. P. 56(e). Because Hills's statement is hearsay, the Court cannot consider it. *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (stating that "'sheer hearsay' . . . 'counts for nothing' on summary judgment") (quoting *Gleklen,* 199 F.3d at 1369)). Furthermore, even if the Court were to consider Hill's alleged statement, it only proves that Hills believed that Burlew should get fired — a belief that

13

recommended that Burlew be placed on probation in early 2007 and that ATC discounted Plaushin's opinion "in favor of the less-informed opinions of men." Pl.'s Opp'n at 11 n.5. As previously stated, however, Plaushin also expressed concern regarding Wicks's management and delegation skills. Moreover, even if the Court were to find that Plaushin believed that Wicks was completely blameless for the events that transpired in the D.C. office, ATC did not terminate Wicks until almost three months after Plaushin left ATC. During that time, many events occurred that influenced ATC's decision to terminate Wicks. Indeed, two of the events that Satterfield stated played a role in Wicks's termination, Heidke's report to ATC and the violation of the 2007 Agreement, occurred subsequent to Plaushin's departure. Therefore, in light of the evidence, Wicks has failed to show that ATC's stated belief regarding her "judgment, listening skills, and management style" is not reasonable and not the real reason she was terminated.

  Finally, Wicks attempts to show that ATC's reasons were pretextual by showing that she was not treated the same as a similarly situated white male. Wicks argues that Satterfield, a white male, once supervised a female employee, Blankenheim, who was terminated for insubordination. According to Wicks, "the important difference" between Satterfield's situation and her situation is that in her situation "the female supervisor (Plaintiff) was then terminated along with the intractable male employee (Mr. Burlew), while the male supervisor (Mr. Satterfield) was allowed to retain his position despite his failure to rein in his 'insubordinate' female employee (Ms. Blankenheim)." Pl.'s Surreply at 4.

  Wicks's argument is unconvincing. Wicks has only shown that Satterfield, at one time, was deficient in his supervision of an "insubordinate" employee and was not terminated; she has

---

ATC ultimately shared as evidenced by Burlew's termination.

failed to demonstrate, however, that Satterfield is similarly situated in *all* material respects. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (to prove that she is similarly situated to another employee, a plaintiff must "demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the [allegedly comparable] employee") (internal quotation marks and citations omitted); *Neuren v. Adduci, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (same). Wicks has provided no evidence to show that Satterfield engaged in the same allegedly inappropriate behavior for which she was disciplined when it came to dealing with his "insubordinate" employee.[7] Without any evidence that Satterfield engaged in similar conduct when dealing with his insubordinate employee, Wicks cannot show that she is similarly situated to Satterfield. Therefore, Wicks has failed to produce any evidence of disparate treatment.[8]

---

[7] Wicks also fails to present any evidence regarding the respective positions of Satterfield and Blankenheim and the period of time each was employed at ATC prior to Blankenheim's termination. Such information is also critical in determining whether employees are similarly situated. *See Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (holding that employees were not similarly situated when they did not have the "same position" or "work[] in the same branch of the agency"); *Wilson v. Washington Metro. Area Transit Auth.*, 631 F. Supp. 2d 58, 71 (D.D.C. 2009) (holding that plaintiff was not similarly situated to another employee because plaintiff had worked for the employer for a shorter period of time).

[8] In an additional effort to show disparate treatment, Wicks makes two separate but related arguments concerning ATC's severance packages. Neither argument is persuasive. First, Wicks alleges that Burlew received a more generous severance package than she did. Upon their termination, however, both Burlew and Wicks were offered the same severance package, but Burlew later negotiated with ATC to receive additional terms. Decl. of Maureen Hogan at 1-2. The fact that Burlew negotiated with ATC to get a better severance package while Wicks did not is not evidence of disparate treatment. Second, Wicks contends that while ATC granted Burlew's request for several additional months of severance and assistance with COBRA payments, it denied a similar request by Blankenheim, a female employee who was also terminated for insubordination. As ATC notes, however, Blankenheim's initial overall severance package exceeded Burlew's renewed package by over $100,000. *See* Defs.'s Sur-Surreply, Second Decl. of Maureen Hogan, Ex. 1.

In sum, after careful consideration of the summary judgment record, the Court finds that Wicks is unable to present evidence that would permit a reasonable jury to conclude that ATC's proffered reason for terminating her was a pretext for unlawful discrimination.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that ATC's motion for summary judgment [#26] must be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge